**ALDRICH LAW FIRM, LTD.**
JOHN P. ALDRICH, ESQ. (NV Bar No. 6877)
1601 S. Rainbow Blvd., Suite 160
Las Vegas, NV 89146
Telephone: (702) 853-5490
Fax: (702) 227-1975
john@johnaldrichlawfirm.com

**ROWLEY LAW PLLC**
SHANE ROWLEY (*to be admitted* pro hac vice)
DANIELLE ROWLAND LINDAHL (*to be admitted* pro hac vice)
50 Main Street, Suite 1000
White Plains, NY 10606
Telephone:  (914) 400-1920
Fax: (914) 301-3514
srowley@rowleylawpllc.com
drl@rowleylawpllc.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| MICHAEL FROMBERGER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> OMEGA PROTEIN CORPORATION, BRET D. SCHOLTES, DAVID A. OWEN, DAVID H. CLARKE, DAVID W. WEHLMANN, GARY R. GOODWIN, MICHAEL N. CHRISTODOLOU, STEPHEN C. BRYAN, DR. CELESTE A. CLARK, ALPHA MERGERSUB, INC., and COOKE INC., <br><br> Defendants. | Civil Action No. <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMAND** |

Plaintiff Michael Fromberger ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of

counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of Omega Protein Corporation ("Omega" or the "Company") against Omega's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a),  and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Cooke Inc. through its wholly owned subsidiary Alpha MergerSub, Inc. ("Merger Sub" and collectively with Cooke Inc. "Cooke").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on October 30, 2017.  The Proxy recommends that Omega shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby Omega is acquired by Cooke. The Proposed Transaction was first disclosed on October 6, 2017, when Omega and Cooke announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Cooke will acquire all of the outstanding shares of common stock of Omega for $22.00 per share (the "Merger Consideration").  The deal is valued at approximately $500 million and is expected to close towards the end of 2017 or early in 2018.

3.      Omega produces fishmeal and fish oil for animal consumption, as well as products for human nutrition. While fishmeal and fish oil are expected to see increases in price over the next 13 years, the Board accepted an offer from Cooke that was justified by last year's financial information. The Board agreed to the Proposed Transaction after two years of public

pressure by an activist investor, a proxy fight that led to two new directors, and two years of strategic reviews. Seemingly exhausted, the Board agreed to sell the Company to Cooke for an inadequate price and through an unfair process.

4.      Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Omega management, as well as the financial analyses conducted by J.P. Morgan Securities LLC ("J.P. Morgan"), Omega's financial advisor.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to Omega's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Omega's shareholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

### PARTIES

6.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Omega.

7.      Defendant Omega is a corporation organized and existing under the laws of the State of Nevada.  The Company's principal executive offices are located at 2105 City West Boulevard, Suite 500, Houston, Texas 77042.  Omega common stock trades on NYSE under the ticker symbol "OME." Omega produces animal and human nutrition products derived from fish, as well as plants and dairy sources.

8. Defendant Bret D. Scholtes has been President and CEO of the Company since 2012 and a director of the Company since 2013.

9. Defendant David A. Owen has been a director of the Company since2010.

10. Defendant David H. Clarke has been a director of the Company since 2016.

11. Defendant David W. Wehlmann has been a director of the Company since 2012.

12. Defendant Gary R. Goodwin has been a director of the Company since 2006.

13. Defendant Michael N. Christodolou has been a director of the Company since 2016.

14. Defendant Stephen C. Bryan has been a director of the Company since 2014.

15. Defendant Dr. Celeste A. Clark has been a director of the Company since June 2017.

16. Defendants Scholtes, Owen, Clarke, Wehlmann, Goodwin, Christodolou, Bryan and Clark are collectively referred to herein as the "Board."

17. Defendant Cooke Inc. is a corporation organized and existing under the laws of the province of New Brunswick, Canada. Cooke Inc. maintains its principal offices in New Brunswick, Canada. Cooke Inc. produces and distributes both farm-raised and wild caught seafood products.

18. Defendant Merger Sub is a corporation organized and existing under the laws of the State of Nevada and is a wholly owned subsidiary of Cooke Inc.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

20.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Omega is incorporated in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Omega common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

23.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of October 2, 2017, Omega had approximately 22.6 million shares outstanding.

(b)     Questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)   Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(v)     Whether the Individual Defendants breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(vi)    Whether the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(vii)   Whether the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(viii)   Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives, including offers from interested parties for the Company or its assets;

(ix)   Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(x)   whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)   Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)   Plaintiff's claims are typical of those of the other members of the Class.

(e)   Plaintiff has no interests that are adverse to the Class.

(f)   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)   Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)   Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

/ / /

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Company Background

24.     Omega operates in two separate industries: animal nutrition and human nutrition. The animal nutrition segment focuses on producing and distributing fishmeal and fish oil for use in animal feed. The human nutrition segment focuses on producing and procuring products like fish oils, plant oils, dairy proteins and nutraceuticals.  The animal nutrition segment brought in $262.5 million in revenues in 2016 compared to $128.2 million from the human nutrition segment.

25.     The main source for Omega's fishmeal and fish oil is menhaden, a herring-like fish found off the coast of the United States of America in the Atlantic Ocean and Gulf of Mexico. For Omega, menhaden are the foundation of its business, with 104 million pounds of fishmeal and 15.4 million pounds of fish oil contracted for sale in 2017 as of December 31, 2016.

### B. The Proposed Transaction is Unfair to Stockholders

26.     On October 5, 2017, the Board entered into the Merger Agreement with Cooke. The Proposed Transaction offers Omega stockholders an unfair price for their investment, agreed to by the Board after an unfair process.

Unfair price

27.     Omega's menhaden-derived products are used in aquaculture, the raising and harvesting of fish. Over the past three decades, aquaculture production has grown from 7% of total global fisheries to more than 40%,[1] and from 5 million tons to 63 million tons.[2] According

---

[1]"The growth of global aquaculture – Fishy business," Deloitte, *available at* https://www2.deloitte.com/au/en/pages/consumer-business/articles/the-growth-of-aqua-culture-fishy-business.html.

to the World Bank, demand for fishmeal and fish oil is expected to grow as aquaculture grows.[3] The price for fishmeal is expected to increase by 90% between 2010 and 2030, while the price for fish oil is expected to increase by 70%.[4] The Organization for Economic Co-operation and Development ("OECD") and the UN Food and Agriculture Organization ("FAO") predict that between 2017 and 2026, nominal prices for fishmeal and fish oil will increase with annual growth rates of 3.4% and 2.0%, respectively.[5]

28.     While 2016 saw a global decrease in fishmeal production, the OECD and FAO see production increasing.[6] The OECD and FAO project that production of fishmeal and fish oil will fluctuate between 2017 and 2026, but prices for fishmeal will increase by 43.25% and prices for fish oil will increase more than 27.8%:

| | | Average 2014-16est | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FISH OIL[9]** | | | | | | | | | | | | |
| **World** | | | | | | | | | | | | |
| Production | kt | 881.2 | 968.1 | 962.2 | 982.3 | 982.8 | 909.0 | 959.2 | 962.3 | 964.0 | 968.9 | 925.6 |
| from whole fish | kt | 566.8 | 645.0 | 634.0 | 628.5 | 623.8 | 565.0 | 609.9 | 607.7 | 603.9 | 601.1 | 554.0 |
| Consumption | kt | 905.1 | 894.4 | 963.9 | 964.0 | 964.4 | 961.6 | 912.7 | 961.8 | 963.5 | 966.4 | 976.1 |
| Variation in stocks | kt | -23.9 | 73.7 | -1.7 | -1.6 | -1.6 | -52.6 | 46.4 | 0.5 | 0.5 | 0.5 | -50.5 |
| Price[7] | USD/t | 1 808.3 | 1 607.9 | 1 622.9 | 1 641.3 | 1 657.2 | 1 907.2 | 1 720.2 | 1 747.0 | 1 774.4 | 1 794.8 | 2 055.8 |
| **Developed countries** | | | | | | | | | | | | |
| Production | kt | 394.2 | 354.3 | 354.2 | 356.0 | 357.1 | 360.0 | 359.3 | 360.6 | 362.0 | 363.7 | 367.8 |
| from whole fish | kt | 206.1 | 171.9 | 169.4 | 168.3 | 167.1 | 167.9 | 164.8 | 163.9 | 163.0 | 162.1 | 163.8 |
| Consumption | kt | 534.6 | 502.0 | 529.8 | 526.6 | 524.8 | 540.1 | 482.2 | 515.2 | 511.8 | 510.2 | 536.9 |
| Variation in stocks | kt | -4.7 | 28.7 | 0.3 | 0.4 | 0.4 | -25.6 | 21.4 | 0.5 | 0.5 | 0.5 | -25.5 |
| **Developing countries** | | | | | | | | | | | | |
| Production | kt | 487.0 | 613.9 | 608.0 | 606.3 | 605.7 | 549.0 | 599.9 | 601.7 | 602.0 | 603.2 | 557.8 |
| from whole fish | kt | 360.7 | 473.1 | 464.6 | 460.2 | 456.7 | 397.1 | 445.0 | 443.8 | 440.9 | 438.9 | 390.2 |
| Consumption | kt | 370.5 | 392.4 | 434.1 | 437.4 | 439.6 | 421.5 | 430.5 | 446.7 | 451.7 | 456.3 | 439.2 |
| Variation in stocks | kt | -19.2 | 45.0 | -2.0 | -2.0 | -2.0 | -27.0 | 25.0 | 0.0 | 0.0 | 0.0 | -25.0 |
| **OECD** | | | | | | | | | | | | |
| Production | kt | 513.6 | 469.2 | 468.4 | 469.1 | 470.5 | 466.8 | 470.6 | 474.4 | 477.3 | 480.7 | 474.7 |
| from whole fish | kt | 274.4 | 238.0 | 234.0 | 230.8 | 228.8 | 221.9 | 222.4 | 222.9 | 222.4 | 222.1 | 212.6 |
| Consumption | kt | 682.9 | 640.8 | 673.2 | 870.5 | 869.2 | 671.7 | 821.1 | 660.9 | 658.4 | 657.2 | 669.7 |
| Variation in stocks | kt | -8.0 | 43.7 | 0.3 | 0.4 | 0.4 | -35.6 | 31.4 | 0.5 | 0.5 | 0.5 | -35.5 |

[2]"Fish to 2030: Prospects for Fisheries and Aquaculture," World Bank Report Number 83177-GLB, Agriculture and Environmental Services Discussion Paper 03, December 2013, *available at* http://www.fao.org/docrep/019/i3640e/i3640e.pdf.

[3]*Id.*

[4]*Id.*

[5] OECD-FAO Agricultural Outlook 2017-2016, *available at* http://www.oecd-ilibrary.org/docserver/download/5117051e.pdf?expires=1509651926&id=id&accname=guest&checksum=93E271CCBF60F67ABFAFC7D4C4C4079D.

[6]"Fishmeal production low in 2016, 2017 forecast looks positive," Food and Agriculture Organization of the United Nations, June 20, 2017, *available at* http://www.fao.org/in-action/globefish/market-reports/resource-detail/en/c/897039/.

FISHMEAL[5]

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **World** | | | | | | | | | | | | |
| Production | kt | 4 385.2 | 4 942.2 | 4 921.4 | 4 932.4 | 4 944.6 | 4 635.5 | 4 933.1 | 4 948.1 | 4 957.0 | 4 973.2 | 4 721.4 |
| from whole fish | kt | 3 205.6 | 3 752.9 | 3 709.9 | 3 694.9 | 3 686.0 | 3 362.0 | 3 634.4 | 3 630.7 | 3 617.8 | 3 610.0 | 3 343.3 |
| Consumption | kt | 4 457.5 | 4 856.0 | 4 929.2 | 4 944.0 | 4 957.2 | 4 811.1 | 4 771.5 | 4 958.4 | 4 967.3 | 4 985.2 | 4 877.5 |
| Variation in stocks | kt | -72.4 | 85.8 | -8.2 | -12.1 | -13.0 | -176.0 | 161.2 | -10.7 | -10.7 | -12.4 | -156.5 |
| Price[6] | USD/t | 1 592.3 | 1 280.9 | 1 200.3 | 1 252.9 | 1 291.0 | 1 558.6 | 1 372.1 | 1 412.0 | 1 442.0 | 1 487.8 | 1 834.9 |
| **Developed countries** | | | | | | | | | | | | |
| Production | kt | 1 414.6 | 1 423.2 | 1 427.5 | 1 439.8 | 1 448.8 | 1 469.3 | 1 460.7 | 1 463.7 | 1 467.3 | 1 472.8 | 1 493.4 |
| from whole fish | kt | 1 025.1 | 1 024.3 | 1 018.6 | 1 018.4 | 1 019.0 | 1 032.0 | 1 013.6 | 1 008.7 | 1 003.3 | 998.6 | 1 010.1 |
| Consumption | kt | 1 618.9 | 1 677.8 | 1 675.6 | 1 619.2 | 1 581.4 | 1 444.4 | 1 437.4 | 1 463.5 | 1 429.7 | 1 402.6 | 1 299.1 |
| Variation in stocks | kt | 3.6 | 28.8 | 2.8 | -1.1 | -2.0 | -47.0 | 44.2 | 0.3 | 0.3 | -1.4 | -47.5 |
| **Developing countries** | | | | | | | | | | | | |
| Production | kt | 2 970.4 | 3 518.9 | 3 493.9 | 3 492.6 | 3 495.9 | 3 166.2 | 3 472.3 | 3 484.4 | 3 489.7 | 3 500.4 | 3 228.0 |
| from whole fish | kt | 2 180.5 | 2 728.6 | 2 691.4 | 2 676.5 | 2 667.0 | 2 330.0 | 2 620.7 | 2 622.1 | 2 614.5 | 2 611.4 | 2 333.2 |
| Consumption | kt | 2 838.7 | 3 178.3 | 3 253.6 | 3 324.8 | 3 375.8 | 3 366.7 | 3 334.1 | 3 495.0 | 3 537.5 | 3 582.6 | 3 578.4 |
| Variation in stocks | kt | -76.0 | 57.0 | -11.0 | -11.0 | -11.0 | -129.0 | 117.0 | -11.0 | -11.0 | -11.0 | -109.0 |
| **OECD** | | | | | | | | | | | | |
| Production | kt | 1 604.4 | 1 687.2 | 1 685.6 | 1 691.5 | 1 699.4 | 1 681.2 | 1 695.6 | 1 709.7 | 1 718.8 | 1 730.6 | 1 692.0 |
| from whole fish | kt | 1 210.6 | 1 282.0 | 1 270.4 | 1 263.6 | 1 263.0 | 1 237.1 | 1 241.5 | 1 247.4 | 1 247.5 | 1 248.9 | 1 201.0 |
| Consumption | kt | 1 810.5 | 1 864.0 | 1 862.9 | 1 815.1 | 1 780.2 | 1 635.0 | 1 633.7 | 1 669.6 | 1 638.7 | 1 615.6 | 1 501.5 |
| Variation in stocks | kt | -9.0 | 62.8 | 1.8 | -2.1 | -3.0 | -68.0 | 63.2 | -0.7 | -0.7 | -2.4 | -53.5 |

Source: OECD-FAO Agricultural Outlook 2017-2016.

29.     The expected increases in price for fishmeal and fish oil translate to potential profits for Omega.  While the Company currently is experiencing a decline in production, according to a September 18, 2017 analysis on SeekingAlpha.com entitled "Omega Protein Is A Good Catch Trading At Book Value And 11.4x TTM P/E," the Company's conservative debt load positions it to withstand such declines. In fact, according to the SeekingAlpha.com analysis, Omega's return on invested capital has averaged 8.4% over the past decade, which includes recent weak quarters.  According to the Proxy, Cooke stated that it would not increase the Merger Consideration because of "Omega's declining 2017 operating results and market prices for fish meal and fish oil as compared to results and market prices in the prior year." Given Omega's potential future profits and the ability to weather production declines, the Merger Consideration is inadequate.

30.     The Merger Consideration appears even more inadequate when considering that Omega's main products make it particularly attractive to companies operating in aquaculture like Cooke.  In a document entitled "Key Messages Delivered by Omega Protein corporation to its Employees," filed with the SEC on October 6, 2017, Omega stated: "This acquisition will create greater long-term opportunities as the Omega Protein business becomes a valuable component of Cooke's vertically integrated aquaculture value chain." Cooke had already been a customer of

Omega, purchasing fish food as "they have for many years" according to the same document. By acquiring Omega, Cooke has a steady supply of food for their farmed fish. Omega stockholders, on the other hand, lose their investment in Omega's bright future.

31.    Given the prospective gain to Cooke, and the Company's growth prospects, the Merger Consideration fails to adequately compensate Omega stockholders. The inadequate Merger Consideration is underscored by the fact that the price offered by Cooke, $22.00 per share, falls below the stock price targets calculated by other analysts. For example, the Wall Street Journal listed an average price target of $23.33, with the high price target being $26.00.

32.    Even the analyses of the Company's own financial advisors illustrate that the Merger Consideration may not be high enough. For example, J.P. Morgan's *Public Trading Multiples* analysis implied a per share equity value as high as $24.90. J.P. Morgan's *Selected Transactions Analysis* implied a per share equity value as high as $23.55, while the *Discounted Cash Flow Analysis* implied a per share equity value as high as $23.50.

Unfair process

33.    The Proposed Transaction not only provides the stockholders with an unfair price, it is also the product of an unfair sales process. Facing pressure from an activist investor to sell the Company, the Board swiftly agreed to the Proposed Transaction despite concerns with the price.

34.    Wynnefield Capital, Inc. and its affiliates (collectively "Wynnefield") took issue with Omega branching out into human nutrition, and sent the Board a letter on August 11, 2015, demanding that the Board sell the Company in order to "unlock" value:

> In the twenty three years of managing our small cap value fund, Wynnefield Capital Management, LLC and its affiliates ("Wynnefield") have never observed a more glaring case of "Diworsification" than the risky and unsuccessful effort of Omega Protein Corporation ("Omega Protein") to enter the human nutrition field.

- 11 -

While the actions of the Board of Directors of Omega Protein may be afforded protection under the "Business Judgement" safe harbor ,the ugly truth is that the Omega Protein Board and its management have flushed away $150 million of shareholder value trying to enter a business that the Board and management lacked the skill sets to integrate, manage or execute on a successful strategic plan. Wynnefield could lay out line by line the details of this tragic and risky misallocation of shareholder equity but we would only be piling on. Omega Protein's public disclosures filed with the Securities and Exchange Commission tell all.

To cut to the chase, Wynnefield believes that, as a result of the Board's poorly analyzed, poorly executed and unsuccessful actions, it has forfeited the right to maintain Omega Protein as a public company. Let's not engage in a costly proxy battle that will ultimately end in Omega Protein's shareholders ousting the current Board over a two year period. Such removal would otherwise be completed in a single year was it not for the fact the Board has "classified" itself as entrenched.

Many boards, including ones on which Wynnefield nominees have served, have made well-meaning but high profile acquisition mistakes that have severely hurt shareholder value. We are not out to embarrass you. Fortunately for the Board and the shareholders that it purports to serve, the ground has recently shifted under the foundation of Omega Protein in a most positive manner. What has been revealed is a clear and simple path to redemption for all involved parties.

Your road forward must entail the immediate hiring of a reputable investment banking firm to explore all strategic alternatives to maximize and release shareholder value, including the sale of Omega Protein or its assets. The Board has before itself a second chance to correct its past mistakes and perform its duty of serving the shareholders that it represents. We would characterize this opportunity as being a "no brainer."

Simple chanting of the mantra - "Daybrook/Oceana" by the Board once in the morning and again at night will keep you on the proper path until you have retained an investment banker to guide you in the exploration of strategic alternatives.

Wynnefield, in fairness to all, has given considerable deliberation to come up with a counter argument to the course of action we insist you straightaway pursue and has come up empty. It's time for the Board to immediately hire an investment banker and run the process to unlock the value in Omega that's staring the entire Board in the face. You will see that this is the right way to proceed rather than engaging in a shootout with Wynnefield that the Board will most surely lose at considerable expense to shareholders. As the record shows, Wynnefield is tenacious, and has repeatedly been successful, when we are confident, as in this instance, we are right.

Any Gary Cooper fan would tell you that it's "High Noon" for Omega Protein's Board. Both you and your shareholders have been handed a second chance. We can all emerge as huge winners.

Don't screw it up- reputations and monetary rewards are at stake for all parties.

Please feel free to email me directly at nobus@wynnecap.com to set up a time to discuss this further.

- 12 -

Tick Tock. Tick Tock.

35.     Wynnefield sent another letter in October 2015 to the Board demanding that the Board consider selling the Company, the human nutrition business segment or face a proxy fight. On February 23, 2016, Wynnefield informed the Board that it intended to nominate three people to the Board, including Defendants Christodolou and Clarke. More letters were published on March 10, 2016, April 28, 2016, May 2, 2016, and May 12, 2016, demanding, among other things, action by the Board on the human nutrition business segment or the strategic alternative review process.

36.     On May 20, 2016, Wynnefield filed a preliminary proxy with two nominees: Defendants Clarke and Christodolou. They were elected to the Board on June 28, 2016 and in August 2016 the Company created a "Human Nutrition Task Force" to consider strategic alternatives for the human nutrition business segment.

37.     As the Board considered what to do with the human nutrition segment, Cooke indicated interest in a transaction between Omega and Cooke. With interest from Cooke and Potential Buyer B, the Board decided against contacting any of the parties contacted in a 2015 review of strategic alternatives. Two months after Cooke lowered its proposed purchase price for Omega from $24.00 per share to $22.00 per share, with no apparent willingness to increase the price, the Board decided to move forward with the Proposed Transaction because the Proposed Transaction "could be viewed as attractive at $22 per share."

38.     After significant pressure from Wynnefield, and the election of Wynnefield's nominees to the Board, the Board approved the Proposed Transaction without conducting an auction for the Company or waiting until after a sale of the human nutrition segment.

**C. Omega's Officers Stand to Receive Benefits Unavailable to the Class**

39.     The Proxy acknowledges that the Company's executive officers have interests in

the merger that may differ from those of the stockholders and may create conflicts of interest.

40.     Stock options, restricted stock and performance units that have been awarded to and are held by Omega's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through Omega's cash incentive performance unit plans and severance agreements, will create a windfall for Omega's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, Defendant Scholtes will receive more than $7.5 million, and the named executive officers of Omega in total stand to receive up to $18.5 million, if they are let go without "cause" (except for John Held, whose employment agreement only requires closing of the Proposed Transaction):

| Name | Cash | Equity | Tax Reimbursement | Total |
|------|------|--------|-------------------|-------|
| Bret D. Scholtes | $2,270,782 | $5,244,554 | – | $7,515,336 |
| Andrew C. Johannesen | $1,105,245 | $300,784 | – | $1,406,029 |
| John D. Held | $5,134,106 | $291,368 | $1,770,769 | $7,196,243 |
| Dr. Mark E. Griffin | $1,064,131 | $291,368 | – | $1,355,769 |
| Montgomery C. Deihl | $891,146 | $198,506 | – | $1,089,652 |

41.     The members of the Board and the executive officers stand to gain handsomely even if they stay on after the Proposed Transaction closes. In total, as demonstrated in the following chart, the executive officers and Board members will obtain $10.8 million:

| | Name | Total Option Consideration | Total Restricted Stock Consideration | Total Performance Unit Consideration |
|------|------|----------------------------|--------------------------------------|--------------------------------------|
| Non-Employee Directors: | David A. Owen | $240,600 | $74,228 | — |
| | David H. Clarke | — | $74,228 | — |
| | David W. Wehlmann | $357,192 | $74,228 | — |
| | Gary R. Goodwin | $240,600 | $74,228 | — |
| | Michael N. Christodolou | — | $74,228 | — |
| | Stephen C. Bryan | — | $74,228 | — |
| | Dr. Celeste A. Clark | — | $74,228 | — |
| Executive Officers: | Bret D. Scholtes | $4,547,000 | $697,554 | $989,450 |
| | Dr. Mark E. Griffin | — | $291,368 | $414,267 |
| | John D. Held | — | $291,368 | $414,267 |
| | Joseph R. Vidal | — | $172,546 | $280,786 |

| Andrew C. Johannesen | — | $300,784 | $425,827 |
| Mark. A. Livingston | — | $88,704 | $77,067 |
| Montgomery C. Deihl | — | $198,506 | $271,500 |

## D. The Preclusive Deal Protection Devices

42.     As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

43.     By way of example, section 4.03(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting or encouraging inquiries or proposals that could lead to an acquisition proposal. This provision fails to provide a "go-shop" period that would allow the Board to rightfully seek out a better offer for the company.

44.     Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be Cooke. For example, pursuant to section 4.03(c) of the Merger Agreement, the Company must notify Cooke of any offer made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 4.03(d) requires that the Board grant Cooke five (5) business days to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior. Cooke is able to match the unsolicited offer because, pursuant to section 4.03(d)(i) of the Merger Agreement, the Company must provide Cooke with the identity of the party making the proposal and copies of any agreements related to the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

45.     In other words, the Merger Agreement gives Cooke access to any rival bidder's information and allows Cooke a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for Omega, because the Merger Agreement

- 15 -

unfairly assures that any "auction" will favor Cooke and allow Cooke to piggy-back upon the due diligence of the foreclosed second bidder.

46.     In addition, pursuant to section 9.04(b) of the Merger Agreement, Omega must pay Cooke a termination fee of $20 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

47.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.  Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of Cooke's inadequate offer price.

**E.  The Materially Incomplete and Misleading Proxy**

48.     The Individual Defendants owe the stockholders a duty of candor.  They must disclose all material information regarding the Proposed Transaction to Omega stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

49.     On October 30, 2017, Defendants filed the Proxy with the SEC. The purpose of the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether or not to vote their shares in favor of the Acquisition. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, Omega shareholders cannot make a fully informed decision

concerning whether or not to vote in favor of the Proposed Transaction.

### Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts

50.     The Proxy discloses management-prepared financial projections for the Company which are materially misleading.  The Proxy indicates that in connection with the rendering of J.P. Morgan's fairness opinion, J.P. Morgan reviewed "certain internal financial analyses and forecasts prepared by the management of Omega relating to its business."  Accordingly, the Proxy should have, but failed to, provide certain information in the projections that Omega's management provided to the Board and J.P. Morgan.

51.     Notably, Defendants failed to disclose projections for fiscal years 2017 to 2026, as well as the terminal period used in J.P. Morgan's *Discounted Cash Flow Analysis*, for revenue (specifically years 2021 to 2026), operating income (specifically years 2021 to 2026), adjusted EBITDA (specifically years 2021 to 2026), depreciation and amortization (specifically years 2021 to 2026), stock-based compensation expense, cash taxes, capital expenditures, increases in net working capital and unelevered free cash flow. This omitted information is necessary for Omega stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

### Materially Incomplete and Misleading Disclosures Concerning J.P. Morgan's Financial Analyses

52.     First, with respect to the *Public Trading Multiples Analysis*, the Proxy fails to disclose the objective selection criteria for each company, as well as the multiples for 2017E FV/EBITDA and 2018E FV/EBITDA for each company.  The Proxy also fails to disclose whether J.P. Morgan performed any type of benchmarking analysis for Omega in relation to the selected public companies.

53.     Second, with respect to the *Selected Transaction Analysis,* the Proxy fails to

disclose the objective selection criteria for each company, as well as the multiples for TV/LTM EBITDA for each company. The Proxy also fails to disclose whether J.P. Morgan performed any type of benchmarking analysis for Omega in relation to the selected target companies.

54.     With respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the individual inputs and assumptions utilized by J.P. Morgan to derive the discount rate range of 7.5% to 8.5%. The Proxy also fails to disclose the range of implied terminal EBITDA multiples resulting from the analysis. In addition, the Proxy fails to disclose how J.P. Morgan treated stock-based compensation expense for the purposes of this analysis.

### *Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

55.     The Proxy also fails to disclose material information concerning the sales process. Despite Wynnefield's sustained and public campaign to pressure the Board into selling the Company or the human nutrition segment, there is no mention of the campaign or proxy fight in the Proxy. The Proxy fails to disclose any communications between Wynnefield and the Board and/or any of its Committees, or communications between individual members of the Board and Wynnefield. Finally, the Proxy fails to disclose whether the Board discussed communications with Wynnefield at its meetings and, if so, the nature of those discussions.

56.     There is only one mention in the Proxy of Cooke as a customer of Omega. Yet other documents filed with the SEC suggest that Cooke has been a customer of Omega's for years. The Proxy fails to disclose the nature of the relationship between Cooke and Omega, the length of the relationship and the impact of the relationship on Omega's finances.

57.     The Proxy mentions that a "Human Nutrition Task Force" was formed in August 2016 and it included members of the Board and members of Omega's management. Yet the Proxy fails to disclose which members of the Board were also members of the "Human Nutrition Task Force."

58. The Proxy also fails to disclose when the Board learned that BMO Harris, the investment bank advising the Board on a potential sale of WSP, would be serving as a source of financing for Cooke for the Proposed Transaction, and what, if any, action was taken in light of learning that information.

59. According to the Proxy, on August 10, 2017, the Board instructed Omega's management to push for a higher price from Cooke. Yet the Proxy fails to disclose whether discussions to raise the Merger Consideration occurred between August 10, 2017 and September 24-25, 2017, when the Board asked Defendant Goodwin to submit a counterproposal to Cooke with a price of $23.25 per share.

60. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, Omega stockholders are unable to make a fully informed decision in connection with the Proposed Acquisition and face irreparable harm, warranting the injunctive relief sought herein.

61. In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

62. Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

63. Further, the Proxy indicates that on September 17 and 18, 2017, J.P. Morgan

reviewed with the Board its financial analysis of the Merger Consideration and on September 18, 2017 delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion dated September 18, 2017, to the effect that the Merger Consideration was fair, from a financial point of view, to Omega shareholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning J.P. Morgan's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

64.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

## COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

66.     Defendants have filed the Proxy with the SEC with the intention of soliciting Omega shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

67.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Omega, were aware of the omitted information but failed to disclose such information, in violation of

- 20 -

Section 14(a).

68.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

69.    Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of Omega shares and the financial analyses performed by J.P. Morgan in support of its fairness opinion; (iii) the Company's communications and interactions with Wynnefield during the first strategic review in 2015 to 2016; and (iv) the sales process.

70.    Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that J.P. Morgan reviewed and discussed its financial analyses with the Board during various meetings including on September 17 and 18, 2017, and further states that the Board relied upon J.P. Morgan's financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

71.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations

and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.     The Individual Defendants acted as controlling persons of Omega within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Omega and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

74.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was

reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

76.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

77.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

78.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

**Breach of Fiduciary Duties**

79.    Plaintiff repeats all previous allegations as if set forth in full herein.

80.    The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the former public stockholders of Omega and have acted to put their personal interests ahead of the interests of Omega's stockholders.

81.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have knowingly or recklessly and in bad faith unfairly deprived Plaintiff and the

other members of the Class of the true value of their investment in the Company.

82.     The Individual Defendants' recommendation of the Proposed Acquisition will result in change of control of the Company, which imposes heightened fiduciary responsibilities to maximize Omega's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

83.     The Individual Defendants have breached their fiduciary duties of care, loyalty, good faith, candor and independence owed to the stockholders of Omega because, among other reasons:

(a)     they pursued their self-interests at the cost of stockholder value;

(b)     they failed to take steps to maximize the value of Omega to its public stockholders;

(c)     they failed to properly value Omega; and

(d)     they failed to disclose all material information that would permit the Company's stockholders to make a fully informed decision on the Proposed Acquisition.

84.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Omega's assets and will be prevented from benefiting from a value-maximizing transaction.

85.     Plaintiff and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

- 24 -

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and his counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to Omega shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.     Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: November 7, 2017                ALDRICH LAW FIRM, LTD.


JOHN P. ALDRICH, ESQ. (NV Bar No. 6877)

1601 S. Rainbow Blvd., Suite 160
Las Vegas, NV 89146
Telephone: (702) 853-5490
Fax: (702) 227-1975
jaldrich@johnaldrichlawfirm.com

ROWLEY LAW PLLC
SHANE ROWLEY (*to be admitted* pro hac vice)
DANIELLE ROWLAND LINDAHL (*to be admitted* pro hac vice)
50 Main Street, Suite 1000
White Plains, NY  10606
Telephone:  (914) 400-1920
Fax: (914) 301-3514
srowley@rowleylawpllc.com
drl@rowleylawpllc.com


Attorneys for Plaintiff

## CERTIFICATION OF PLAINTIFF

I, Michael Fromberger ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft complaint against Omega Protein Corporation ("Omega Corp.") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in Omega Corp. securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

5. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing information is correct to the best of my knowledge.

Signed this 7th day of November, 2017.

Michael Fromberger

| Transaction (Purchase or Sale) | Trade Date | Price Per Unit | Quantity |
|---|---|---|---|
| Purchase | | $ | |
| OME | 12/5/07 | 7.81 | 100 |
| OME | 12/5/07 | 7.82 | 200 |

Michael Fromberger
Dane County, Wisconsin